IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>　　　Plaintiff,<br><br>　　　　　v.<br><br>**[3] JAVIER LOPEZ-ROJAS,**<br><br>　　　Defendant. | CIVIL NO. 16-056 (PG) |

## OPINION AND ORDER

　　　On January 25, 2016, the United States filed a criminal complaint against defendants Gerardo Diaz-Rosado ("Diaz-Rosado"), Itzamary Ruiz-Vega ("Itzmary" or "Ruiz-Vega"), Javier Lopez-Rojas ("Lopez-Rojas"), Charles Lee Arias-Cruz ("Arias-Cruz"), Onix Rosario-Delgado ("Rosario-Delgado"), and Maria Vega-Ramos ("Vega-Ramos"). Docket No. 3. On February 3, 2016, the grand jury indicted the defendants for having conspired to possess with the intent to distribute more than ten (10) kilograms of cocaine in violation of 18 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846 and 18 U.S.C. § 2. Docket No. 48.

　　　Pending before the court is the defendant Lopez-Rojas' (hereinafter the "defendant" or "Lopez-Rojas") motion to suppress the evidence against him, filed on July 13, 2016. Docket No. 102. On August 1, 2016, the United States filed its response in opposition (Docket No. 106), and on August 12, 2016, a hearing was held.

　　　For the reasons explained below, the court finds that Lopez-Rojas' warrantless arrest and subsequent search on January 24, 2016, and the evidence obtained at that time from the defendant's person and his vehicle, were justified by probable cause. As such, the motion to suppress is **DENIED.**

## I.　FACTUAL FINDINGS

　　　The charges against the defendant stem from an investigation in which approximately ten (10) kilograms of cocaine were seized aboard the cruise ship Jewel of the Seas. The investigation revealed a conspiracy between the defendants to transport narcotics into Puerto Rico.

　　　After having the opportunity to examine the testimony proffered at the suppression hearing by several officers assigned to federal and local

law enforcement agencies, and taking into account each witness' demeanor and credibility, the court makes the following findings of fact.

### *HSI Special Agent Gerardo Mujica*

Special Agent Gerardo Mujica ("Mujica") works for Homeland Security Investigations (HSI) as a Special Agent assigned to Border Enforcement Security Task Force (BEST) in San Juan, Puerto Rico.[1]

While on duty on January 24, 2016, Mujica reported to the Pan American Pier (commonly referred to as the "Pan American dock") in San Juan, Puerto Rico, next to the Isla Grande airport, where the cruise ship Jewel of the Seas was docked for disembarkation. Earlier that morning, Lopez-Rojas' co-defendants had been detained aboard the ship after Customs Border Patrol (CBP) Officers conducted a border inspection and found them in possession of approximately ten (10) kilograms of cocaine.[2] Together with several CBP Officers, Mujica escorted the subjects to the secondary Customs inspection area for questioning, which ultimately led to Lopez-Rojas' identification and arrest.

Mujica testified that he participated in the interview of co-defendant Itzamary Ruiz-Vega, who stated that she was traveling aboard the cruise ship to smuggle 10 kilograms of cocaine that would be hand delivered to "a fat individual...known to her as 'El Gordo'... ." Transcript at page 11. She also mentioned that said individual drove a red, compact or "boxy" vehicle. Id. Mujica's supervisor (Francisco Gregory) relayed that information to task force agents at the scene and instructed them to surveil the area in order to locate the individual and vehicle matching the description provided by Itzamary. The agents surveilling the area identified Lopez-Rojas inside a red vehicle - a red Scion - and took photographs of the subject and his car.[3] The photos were transmitted to

---

[1] Mujica has been a Special Agent for HSI since approximately September of 2014. He completed a 12-week criminal investigatory training program, as well as a 16-week special agent investigation training program. Transcript of Suppression Hearing ("Transcript"), held on Friday, August 12, 2016, at page 8.

[2] As part of their inspection and search, CBP deployed a canine on the vessel which alerted to the presence of narcotics in the three cabins assigned to co-defendants. Contraband - ten (10) brick-shaped objects wrapped in plastic tape – was found inside co-defendant Itzamary's suitcase.

[3] The government's Exhibit No. 1 was the photo taken of the defendant in the area surrounding the Pan American dock which several co-defendants identified as "El Gordo," the individual who would receive the narcotics, driver of the red vehicle.

The government's Exhibit No. 2 depicts the red vehicle – a Scion – belonging to or operated by the defendant. The agents located the vehicle based on the description

Mujica and other agents at the secondary inspection area. Mujica then showed the photographs to Itzamary, who confirmed the identity of the defendant as El Gordo, the heavy-set male, driver of the red vehicle, who would receive the narcotics at the dock. Id. at pp. 13-14.

Mujica also testified that he participated in the interview of a female security officer working at the passenger entry/exit area of the Pan American dock on the date of defendant's arrest. When interviewed at the scene, the security officer informed that the defendant, Lopez-Rojas, had approached her and indicated that he was there to provide an undisclosed amount of cash to a passenger aboard the cruise ship by the name of Itzamary in order to cover an unpaid balance at the cruise's bar. When shown the photograph taken by law enforcement agents of Lopez-Rojas, the security officer confirmed his identity as the individual who approached her and asked about Itzamary. See id. at page 16.

### *PRPD Officer Felipe Rivera-Rivera*

Officer Felipe Rivera-Rivera ("Rivera") is a police officer at the Puerto Rico Police Department ("PRPD") assigned to the HIS-BEST in San Juan, who partook in the defendants' arrest on January 24, 2016.[4]

During the hearing, Rivera testified he participated in the interview of co-defendant Rosario-Delgado, who, *inter alia,* indicated that the 10 kilograms of cocaine being transported aboard the cruise ship would be delivered at the Pan American dock to a fat individual who drove a red Scion. Id. at pp. 38-39. That information was communicated to law enforcement agents conducting surveillance outside the dock, who were then able to locate and photograph the defendant inside a red vehicle matching the description provided by Rosario-Delgado.

Back in the secondary inspection cabin, the photographs that had been taken of Lopez-Rojas and the red Scion were shown to Rosario-Delgado.[5] Officer Rivera testified that at that point in time, Rosario-Delgado positively identified the defendant as the person to which the contraband would be delivered. As for the vehicle, Rosario-Delgado

---

provided by other co-defendants while detained. Various co-defendants further identified that vehicle as belonging to Lopez-Rojas. Id. at page 35.

[4] Rivera has been a police officer for over 20 years, and a task force agent with HSI for 13 years. Id. at page 37.

[5] During the hearing, Officer Rivera identified the government's Exhibit Nos. 1 and 2 as the photographs taken by law enforcement at the scene on January 24, 2016 and that were shown to co-defendant Rosario-Delgado during questioning. See id. at pp. 42-43.

positively identified the same as the vehicle of the person who was supposed to pick up the drugs. Id. at page 41. Once a positive identification was obtained from co-defendant, his supervisor was notified. Officer Rivera further testified that although he remained at the secondary inspection area, he was aware that the subject identified by Rosario-Delgado was later detained. Id.

### *Officer Edelmiro Jimenez*

Officer Edelmiro Jimenez ("Jimenez") is an Officer at Ports Authority, who has been assigned to a task force with HSI-ICE[6] for over six years. Transcript at page 49.

Jimenez testified that on January 24, 2016, he was called to the scene at the Pan American dock in San Juan and instructed to identify a red vehicle at the parking lot area. Id. at page 50. After receiving the necessary information, Officer Jimenez surveilled the parking lot area and located two vehicles – one red and the other, burgundy – that were parked next to each other. Jimenez took photographs of the vehicles. He, alongside fellow officers, showed the photographs to other agents at the scene, including SA Mujica and Officer Rivera. Id. at page 51. Jimenez also testified that he later found out that one of the co-defendants being interviewed made a positive identification of the photographs.[7]

During the hearing, Jimenez testified that he had also received information in order to locate a tall and heavyset person. Nonetheless, Jimenez was only able to locate the vehicle, not the individual.

### *HSI Special Agent Rolando Rojas*

Special Agent Rolando Rojas ("Rojas") works for Homeland Security Investigations (HSI) as a Special Agent assigned to Immigrations and Customs Enforcement ("ICE") since 2007.[8]

During the hearing, SA Rojas testified that he was assigned to an investigation at the Pan American dock in San Juan on January 24, 2016. Upon arriving at the Customs inspection area, Rojas, along with other HSI

---

[6] "ICE" stands for U.S. Immigration and Customs Enforcement.

[7] Officer Jimenez identified the government's Exhibit No. 2 as the photograph he took of the defendant's red vehicle. Id. at page 52.

[8] In order to become a special agent with HSI-ICE, Rojas received training about immigration and customs laws, as well as investigatory training focusing on child pornography, drug smuggling, and money laundering. Prior to joining HSI-ICE, Rojas worked for Customs and Border Protection for four years. Before that, he worked as a PRPD Officer for eight years. Transcript of Suppression Hearing ("Transcript"), held on Monday, August 15, 2016, at page 8.

agents and taskforce officers, received information and a description of an individual and vehicle expected to arrive at the pier in connection with a drug smuggling transaction involving a passenger that had been arrested by CBP Officers after being found in possession of narcotics. Rojas testified that he received the subject's description from the agents at the secondary inspection area who were questioning the detained passengers. The description that was provided concerned a white, fat male and a red vehicle. After receiving that information, Rojas initiated surveillance in the area outside the dock. See Transcript at pp. 4-5.

Rojas testimony shows that he observed an individual matching the description that he received standing close to the terminal's main entry/exit area, looking at the passengers exiting the dock. During that time, Rojas saw the defendant making calls from his cellular phone. He also observed Lopez-Rojas approach and talk to the female security officer at the entry/exit area, although it was only later that he learned the content of their conversation.[9] Rojas then saw the individual walk towards a compact, red vehicle, reach something in his waistband area and place it inside the vehicle as he got inside. At that point, Rojas requested assistance from one of the agents who was surveilling the defendant in order to conduct the arrest.

As part of his testimony, SA Rojas explained that together with a fellow agent, he approached the vehicle and thereafter handcuffed the defendant. Rojas testified that by then, the detained co-defendants had confirmed the identity of Lopez-Rojas using the photographs taken by task force officers at the scene.[10] See id. at pp. 8-9.

Having observed the defendant reach towards his waist area prompted Rojas to conduct an immediate safety search of the vehicle. Id. at page 10. As a result thereof, he seized an envelope found in the passenger seat of the vehicle containing U.S. currency that, pursuant to the investigation, would be given by Lopez-Rojas to one of the detained co-

---

[9] As previously noted, SA Mujica, who participated in the security officer's interview, testified that she positively identified the defendant as the subject who had approached her at the passenger exit area to inquire about a female passenger by the name of Itzamary to whom he was supposed to provide an undisclosed amount of cash. See section I of the instant opinion and order, *supra,* at pp. 2-3.

[10] During the hearing, SA Rojas identified the government's Exhibit No. 1 as a photograph of the subject that he observed near the dock's passenger entry/exit area while surveilling the scene on January 24, 2016. Rojas also made an in-court identification of the defendant as the subject photographed in Exhibit No. 1. See id. at page 11.

defendants. When asked, however, Lopez-Rojas stated that he was supposed to give the money to a female passenger but that he could not recall her name. See id. at page 12.

### *K9 Enforcement Officer Adriel Castillo*

K9 Enforcement Officer Adriel Castillo ("Castillo") works for U.S. Customs and Border Protection as the K9 Handler for K9 Honzo.[11]

During the hearing, Officer Castillo testified that on January 24, 2016, he was called to provide K9 assistance during the inspection of several cabins of the Jewel of the Seas. Officer Castillo confirmed that during that inspection, K9 Honzo alerted the presence of narcotics in one of the cabins. After the narcotics were found, several passengers were taken to the secondary inspection area for questioning. See Transcript of Suppression Hearing held on Friday, August 12, 2016, at page 65.

Officer Castillo also testified that on that same date, he was asked to run K9 Honzo, on a vehicle that he described as a red Scion.[12] Castillo's uncontroverted testimony shows that K9 Honzo alerted the presence of narcotics found in the trunk of the red Scion. Id. at pp. 66-67. Castillo also testified that the vehicle's driver, whom he described as a "big guy," stated several times that he was a drug user. Once the vehicle's trunk was opened, K9 Honzo alerted the presence of narcotics for a second time. There, Officer Castillo found a bag containing empty cigarette boxes with what appeared to be crack capsules inside. K9 Honzo also made an alert at the passenger seat of the vehicle where the envelope containing U.S. currency was found. Id. at page 70.

## II.   DISCUSSION

Lopez-Rojas seeks the suppression of the evidence seized after law enforcement agents intervened with him for several reasons. First, he argues that the agents had no reasonable suspicion to conduct a Terry investigatory stop. Second, the defendant contends that, at any rate, the

---

[11] In his motion to suppress, the defendant challenges the reliability of the canine inspection conducted by K9 Honzo and his Handler, Officer Castillo as "a source of probable cause." See Docket No. 102 at page 6. Nonetheless, Castillo's uncontroverted testimony regarding the training and certifications received by the canine as well as himself provides sufficient indicia of reliability so as to disperse any challenge raised by the defendant.

[12] During the hearing, Officer Castillo identified the government's Exhibit No. 2 as a photograph of the red Scion subject to the K9 inspection on January 24, 2016. Id. at page 68. Castillo also made an in-court identification of the defendant as the subject who was inside the red vehicle and who admitted being a drug user several times during the vehicle's inspection. Id. at page 70.

agents' intervention was not a Terry stop, but rather, amounted to a *de facto* arrest followed by a "full and invasive search" of his person and his vehicle. The defendant claims, *a fortiori,* that no probable cause existed at that moment to justify his arrest. As such, the defendant argues that all of the evidence against him was obtained in violation of his rights under the Fourth Amendment.

### A. The Stop

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. With limited exceptions, warrantless searches are *per se* unreasonable. See Coolidge v. New Hampshire, 403 U.S. 443, 454–55, 91 S.Ct. 2022 (1971); see also United States v. Camacho, 661 F.3d 718, 723 (1st Cir.2011). Often, ensuring the Fourth Amendment's protection "requires suppression of evidence that is the product of an unlawful search or seizure."

A Terry-type intervention allows police officers to stop and briefly detain an individual for investigative purposes if the police have a reasonable suspicion that criminal activity is afoot. United States v. Dapolito, 713 F.3d 141, 147 (1st Cir.2013)(citing United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989); Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968); United States v. Pontoo, 666 F.3d 20, 27 (1st Cir.2011)). The Terry analysis commonly involves two considerations, the first of which is to examine whether particular and articulable facts existed for suspecting of the individual intervened with, while the second demands analyzing the objective basis or circumstances which justified the intervention with deference to the expertise of a reasonable law enforcement officer. See Dapolito, 713 F.3d at 148; United States v. Cook, 277 F.3d 82, 85 (1st Cir.2002)(noting that "reasonable suspicion" analysis requires "undertak[ing] a contextual analysis using common sense and a degree of deference to the expertise that informs a law enforcement officer's judgments about suspicious behavior.")(citation omitted).

In determining whether either reasonable suspicion was present, courts look to the totality of the circumstances. Dapolito, 713 F.3d at 148 (citing United States v. Cortez, 449 U.S. 411, 417 101 S.Ct. 690 (1981)("[T]he essence of all that has been written is that the totality of the circumstances –the whole picture- must be taken into account.")).

In the instant case, the circumstances surrounding the defendant's investigatory stop began to unravel during the border search conducted by CBP officers. Although neither party has raised the issue of the border search under the Fourth Amendment, the court must note that Custom's authority to conduct border searches is very well settled. See United States v. Ramsey, 431 U.S. 606, 97 S.Ct. 1972 (1977); U.S. v. Perez Rivera, 247 F.Supp.108 (D.P.R.2003)(discussing what is commonly referred to as the "border search exception" under the Fourth Amendment). As a result of this particular border search, 10 kilograms of narcotics were seized by CBP Officers. Law enforcement soon uncovered a drug trafficking venture between passengers aboard the Jewel of the Seas and the defendant.

The First Circuit has recognized that the collective knowledge of the officers who jointly make an investigatory stop may prove useful in determining the legitimacy of such action. See Cook, 77 F.3d at 86. Here, the testimony of the law enforcement agents during the suppression hearing shows that several co-defendants being interviewed at the secondary inspection area admitted a drug smuggling activity. More importantly, at least two co-defendants indicated that a heavy-set male inside a red, compact vehicle would receive the contraband at the port. The credible and uncontroverted testimony given by the agents established that law enforcement personnel soon located and identified Lopez-Rojas inside his red vehicle based on the description provided by the co-defendants. The information given by the detained co-defendants, as it pertained to Lopez-Rojas' physical description and that of his vehicle, was materially consistent in all respects. Also, the uncontroverted testimony of the agents demonstrates that at that point, the agents' had some significant, prior knowledge of Lopez-Rojas and his potential involvement in the drug smuggling venture.

Also significant is the fact that law enforcement agents set out to independently corroborate the information provided by co-defendants through physical surveillance of the defendant at the scene. As previously noted, the defendant was physically located and observed both at the entry/exit area of the dock and inside his car. SA Agent Rojas testified that he engaged in constant surveillance of the defendant and observed him talking to the security officer at the entry/exit area. When the security officer was interviewed by other law enforcement personnel, including SA

Mujica, she indicated that the defendant had approached her to inquire about a passenger by the name of Itzamary. That passenger had been detained during the preliminary border inspection after the contraband was found in her suitcase.

As surveillance of the defendant progressed, photographs of him and his vehicle were taken at the scene and shown to the detained co-defendants. Again, the agents' uncontroverted testimony shows that positive identifications of the subject and his vehicle were obtained from several of the detained co-defendants and the security officer at the dock's passenger entry/exit area. This not only provided the agents with the required reasonable suspicion to make the investigatory stop, but more importantly, gave them probable cause to place Lopez-Rojas under arrest.[13]

The court notes that the defendant's presence at the scene and his behavior in, for example, looking towards the passengers exiting the dock or making numerous phone calls is not, in and of itself, inherently suspicious conduct. See e.g. United States v. Fernandes, 708 F.Supp.2d 130, 136 (D.Mass.2010)(citing Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673 (2000)("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.")). Nonetheless, the fact that co-defendants' positively identified Lopez-Rojas as the heavyset individual, driver of a red, compact vehicle, who would receive the contraband at the dock, coupled with the verified information gathered as the investigation progressed, and the observations made by the trained law enforcement agents surveilling the defendant at the scene, gave rise to a reasonable suspicion that the defendant may have committed, was committing, or was about to commit a crime. See United States v. Stanley, 915 F.2d 54, 56-57 (1st Cir.1990)(Terry stop reasonable where, just past midnight, defendant was sitting alone in his car in a high-crime area; appeared to be engaged in some purposeful though undefined drug-related activity; and appeared to hide something under his seat when he saw the officers approach).

In light of the totality of the circumstances recounted above, and ceding the "[d]eference [] due to the experienced perception of the

---

[13] Out of an abundance of caution, however, the court will analyze the defendant's arrest under the more stringent "probable cause" standard.

officers," United States v. Woodrum, 202 F.3d 1, 7 (1st Cir.2000), the court concludes that Lopez-Rojas' initial stop was justified at its inception.

### B. The Arrest and Search

The defendant argues that he was arrested and subjected to a "sweeping search" without the required probable cause. Docket No. 102 at pp. 5-6. He further claims that at the time of his arrest, the agents did not have any reasonable basis to believe that he was armed.

It is blackletter law that a warrantless arrest or search must be supported by probable cause. See e.g., Ornelas v. United States, 517 U.S. 690, 695, 116 S. Ct. 1657 (1996); United States v. Watson, 423 U.S. 411, 417-18, S.Ct. 820 (1976). "Probable cause for an arrest 'exists when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators.'" United States v. Brown, 500 F.3d 48, 56 (1st Cir.2007)(quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 9 (1st Cir.2004)). On the other hand, "[p]robable cause for a search can be demonstrated by facts and circumstances ... sufficient in themselves to warrant a man of reasonable caution in the belief that he was observing criminal activity and the fruits of criminal activity." United States v. Capelton, 350 F.3d 231, 240–41 (1st Cir. 2003)(quoting United States v. Ferrara, 539 F.2d 799, 801 (1st Cir.1976))(internal quotation marks omitted).

Having concluded that the agents' initial stop of Lopez-Rojas was appropriate, see Terry, 392 U.S. at 20 (holding that a brief, investigatory stop of a suspect only requires a reasonable suspicion that criminal activity is afoot), the court must determine whether the agents, after stopping the defendant, developed probable cause for the ensuing arrest and search.

The record shows that as during the course of the investigation, as the agents were closing in on the defendant, SA Rojas observed the suspect reach towards his waistband and place something inside the car. Ordinarily, this alone justifies conducting a limited, precautionary frisk of the suspect. The record also shows that the agents conducted a precautionary search of the vehicle for a possible weapon. During that search, the agents found an envelope on the passenger seat of the vehicle

with cash, as well as an envelope from a U.S. Courthouse which immediately caught SA Rojas' attention. Upon being questioned about his presence at the dock, the defendant only stated that he was there to give the money that was found in the passenger seat of his vehicle to a female passenger. Lopez-Rojas denied knowing that passenger's name. This was materially inconsistent with the information provided by both Itzamary and the security officer at the dock's entrance during the investigation. Finally, after K9 Honzo alerted to the presence of narcotics in the vehicle, crack capsules were found in the trunk.[14]

    At the outset, the court notes that placing a suspect in handcuffs does not necessarily elevate a Terry stop into an arrest. "The use of handcuffs during the course of a stop is appropriate if officers reasonably believe that handcuffs are necessary to protect the officers, the public, or the suspect during the stop." United States v. Brame, 284 F. App'x 815, 819 (1st Cir.2008)(citing United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir.1998)). Moreover, a precautionary frisk of the defendant for possible weapons does not run afoul with the Fourth Amendment. See id. (noting that pursuant to Terry, 392 U.S. at 26-27, an officer engaging in a lawful investigative stop may conduct a frisk of the suspect for weapons). Insofar as the agents were entitled to question Lopez-Rojas about his suspected participation in a drug deal, "their right to detain him did not dissipate after they determined that he was not armed." Cook, 277 F.3d at 87-88.

    More importantly, based on the facts and circumstances outlined above, which are amply supported by the credible and uncontroverted testimony of the agents participating in the investigation and arrest of the defendant, are sufficient in themselves to provide a reasonable officer the belief that he was observing criminal activity or the fruits of criminal activity. See Brown, 500 F.3d at 57 (probable cause to search defendant's vehicle existed where police caught the suspect in several lies and inconsistencies, suspect's demeanor during the stop evoked suspicion, and a police dog alerted to the presence of contraband inside the truck); Capelton, 350 F.3d at 240-41 (identification of defendant as the source of drugs, positive identification of defendant by two officers who had observed defendant, and surveillance of defendant based on

---

[14] The defendant stated several times that he was, in fact a drug user.

Case 3:16-cr-00056-PG   Document 126   Filed 08/24/16   Page 12 of 12
Crim. No. 16-056 (PG)                                                Page 12

officer's description of the vehicle in which he was traveling after leaving the scene of a drug transaction justified stopping defendant, and a frisk that revealed a large wad of money in defendant's front pocket provided sufficient probable cause to justify arrest); United States v. Mann, 215 F.3d 1312 (1st Cir.2000)(district court properly denied defendant's motion to suppress where several individuals previously arrested on drug charges had identified defendant as supplier of drugs, provided information about defendant that was corroborated by criminal investigation and surveillance of defendant, thus giving police officers reasonable suspicion to stop and frisk defendant, and alternatively, police officers had probable cause to arrest defendant when frisk revealed what appeared to be crack); United States v. Pena, No. 1:14-MJ-079PAS, 2014 WL 1609621, at *6 (D.R.I. Apr. 22, 2014)(presence of the defendant at the location of the criminal activity, coupled with paraphernalia, drugs and cash found in defendant's control, defendant's surreptitious behavior to discard some of the evidence, and defendant's attempt to flee, deemed sufficient for probable cause to exist).

Whether the investigative stop of the defendant constituted a *de facto* arrest, as the defendant contends, is inapposite because looking at the totality of the circumstances, the court concludes that probable cause existed to place the defendant under arrest. Therefore, the seizure of the evidence against him was entirely the proper conduct of a search incident to arrest. See Mann, 215 F.3d at 1312 (so concluding).

In light of the foregoing reasons, the defendant's motion to suppress (Docket No. 102) is hereby **DENIED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, August 24, 2016.

S/ JUAN M. PÉREZ-GIMÉNEZ
**JUAN M. PEREZ-GIMENEZ**
**SENIOR U.S. DISTRICT JUDGE**